IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| VERLON ELIZABETH THOMPSON, | ) | |
| *Administratrix of the Estate of Jeremy* | ) | |
| *Lee Thompson,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00651-RAH-JTA |
| | ) | |
| BRANDON ROGERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This case presents a complicated timeline of events spanning over a twenty-four-hour period involving Jeremy Lee Thompson who died from a methamphetamine overdose. His grandmother, as administratrix of his estate ("Estate"), filed this Fourteenth Amendment deliberate indifference action against two groups of law enforcement officials – (1) Geneva Police Department Officers Brandon Rogers and Ethan Hendrix (collectively "Officer Defendants"); and (2) Geneva County Jailers Roland Miller and Andrew German (collectively "Jailer Defendants") – who interacted with Thompson in the hours preceding his death. Discovery now at an end, the Defendants have moved for summary judgment. The motions are fully briefed and ripe for decision. For the reasons set forth below, the motions are due to be GRANTED.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction under 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.  *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" based on materials in the record.  Fed. R. Civ. P. 56(a), (c).  A genuine dispute of material fact exists if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Whether a fact is material is determined by the applicable substantive law.  *Id.*  And a dispute is not genuine if it is unsupported by evidence or only created by evidence that is "merely colorable or is not significantly probative."  *Id.* at 249 (citations omitted).  At this stage, a court views all evidence, and draws all reasonable inferences, "in the light most favorable" to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).  Even so, statements of belief are insufficient to create issues of fact for purposes of defeating a summary judgment motion. *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002); *see* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *see also Macuba v. Deboer,* 193 F.3d 1316, 1322–23 (11th Cir. 1999) ("[Fed. R. Civ. P. 56(c)] applies to testimony given on deposition.").

When the record clearly contradicts the nonmovant's version of the facts, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) ("The Court

of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape."); *see Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010) ("[W]e draw . . . inferences [in the nonmovant's favor] only to the extent supportable by the record." (internal quotations marks omitted) (quoting *Scott*, 550 U.S. at 381 n.8)).   And nor should a court adopt a nonmovant's version of facts that are taken out of context where the "record . . . as a whole could not lead a rational trier of fact to find for the nonmoving party." *Johnson v. Niehus*, 491 F. App'x 945, 950–51 (11th Cir. 2012) (per curiam) (quoting *Scott*, 550 U.S. at 380) (refusing to "cherry pick facts from [nonmovant's] story which support his version of the events and which [could] be reconciled with the otherwise undisputed evidence" (emphasis omitted)); *see also Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 810–11 (11th Cir. 2020) (affirming denial of renewed judgment as a matter of law where the nonmovants "cherry-pick[ed]" evidence in support of "his theory of the case, while ignoring the substantial body of evidence" was "unpersuasive").   "At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Johnson*, 491 F. App'x at 950 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005)).

## BACKGROUND

The events involving Jeremy Thompson occurred during a twenty-four-hour period on May 20 and May 21, 2022, and they are largely evidenced by video footage from the Officer Defendants' body cameras, as well as the video footage from the jail.   Because the issues presented in the Defendants' summary judgment motions turn on the totality of the events over that period, a detailed timeline of the events is necessary.

### A.   May 20, 2022

Officers Brandon Rogers and Ethan Hendrix first encountered Jeremy Thompson on the evening (around 9:00 p.m.) of May 20, 2022, when Thompson's

stepfather, Jeff Schmidt, while in his truck with Thompson, flagged Officer Hendrix down and told Hendrix that Thompson was frantic and hallucinating. (Doc. 52-6 at 20:70:9–20.) Schmidt told Hendrix that he was scared Thompson "might not be alive the next day" if Thompson did not receive help. (Doc. 52-6 at 29:107:18–23, 108:1; Doc. 40-20 at ¶ 42.) Officer Rogers also responded to the scene soon after. (Doc. 40-24 at 40:11–15.)

During their interaction with Thompson, Thompson was communicative, ambulatory, calm yet animated in his mannerisms, and cooperative with requests. (*See generally* docs. 40-4, 40-5.) While speaking with Officers Rogers and Hendrix, Thompson repeatedly voiced complaints about his family, including his stepfather and his "baby momma." (*Id.*) Thompson repeatedly voiced concerns about going to jail, stating that he had never been to prison, that he did not want to go to prison, and that his family was trying to set him up for drugs to send him to prison. (*Id.*)

Based on their interaction with Thompson, neither officer thought that Thompson was intoxicated or in medical distress, (doc. 40-24 at 30:5–8, 36:7–16; doc. 40-25 at 26:12–22; 27:7–17), nor did they believe there was enough evidence to arrest Thompson that evening (doc. 40-24 at 37:8–10). When questioned in his deposition about the interaction, Schmidt testified that in his opinion, when Thompson saw the two officers, Thompson "tried to keep [his behavior] under a little bit of control," but, according to Schmidt, Thompson still exhibited his frantic behavior for the officers. (Doc. 52-6 at 21:74:5–7.) The encounter ended with Thompson walking down the road rather than returning to Schmidt's vehicle.[1] (Doc. 40-24 at 43:11–14.)

---

[1] Schmidt, of course, could have driven Thompson to the hospital if he believed that Thompson was suffering from a medical emergency. He did not do so, instead choosing to flag down law enforcement.

About an hour later, Officer Rogers encountered Thompson again, this time at a local gas station where Thompson was drinking a beer in public. (Doc. 40-7.) Thompson was still communicative, ambulatory, and cooperative, but also still animated in his mannerisms, agitated with his family, and fearful of going to jail. (*See id.*)  Thompson told Officer Rogers that his stepfather "acted crazy on him" earlier that day, that he "just wanted to go home," and that he did not know he could not drink his beer in public. (*Id.*)  Thompson denied using any drugs. (*Id.*)  Officer Rogers then chose to perform a field sobriety test, which Thompson passed. (*Id.*)  Thompson thanked Officer Rogers for the "two chances" he had given Thompson that night, to which Officer Rogers stated, "strike three, you're out" and instructed Thompson to leave the gas station premises.[2] (*Id.*)

## B.   May 21, 2022: The Next Day

### 1.   The Arrest

The next day, Officers Rogers and Hendrix were on patrol together when they received a dispatch call from the Geneva County E-911 Communications Center about a suspicious person. (Doc. 40-19 at ¶ 5; Doc. 40-20 at ¶ 5.)  The dispatch call stated the following:

> Got a call at the Dollar General on North 27.  The caller said there's a white male with sandy-colored hair driving a Honda Accord.  When he first pulled up, he was clutching his chest and mouthing the words "Help me!"  When they asked him if he was okay, he was like talking out of his head.  I asked the clerk there at the Dollar General if there was actually somebody there.  She said there's somebody there in a car with their feet sticking out.  So need you to check that out.

(Doc. 40-1; Doc. 40-19 at ¶ 5; Doc. 40-20 at ¶ 5.)  Though she had the option of doing so, the dispatcher decided not to send an ambulance to the Dollar General. (Doc. 40-19 at ¶ 5; Doc. 40-20 at ¶ 5.)  According to the Officer Defendants, because

---

[2] The inference being that if they saw Thompson again, he would go to jail.

the "Communications Center always dispatches an ambulance to all medical calls," they did not interpret this call as a medical call.  (Doc. 40-19 at ¶ 7; Doc. 40-20 at ¶ 7.)

The Officer Defendants arrived at the Dollar General store and activated their body-worn cameras at 7:09 p.m. (Doc. 40-2; Doc. 40-3; Doc. 40-19 at ¶ 8; Doc. 40-20 at ¶ 8.)  There, they encountered Thompson again, their third encounter with him within the last twenty-four hours.

They interacted with Thompson for around twenty minutes before they arrested him for public intoxication.  (*See* Doc. 40-2; Doc. 40-3.)  During their entire encounter with Thompson in the parking lot, Thompson did not clutch his chest, and he was conscious, alert, compliant with requests, communicative, and ambulatory. (Doc. 40-2; Doc. 40-3.)  Like he was the day before, Thompson was animated in his mannerisms and still agitated and upset with his family, particularly his "baby's momma."  (*See* Doc. 40-2; Doc. 40-3.)  Though they suspected that he was a drug user based on their previous encounters with him, (doc. 40-19 at ¶ 10; doc. 40-20 at ¶ 10), the Officer Defendants did not observe any signs of medical distress or a medical emergency,[3](doc. 40-19 at ¶ 11; doc. 40-20 at ¶ 11).

Also of note, even though the dispatcher reported that a caller had observed Thompson clutching his chest and saying help me, when the Officer Defendants first approached Thompson, he was not clutching his chest.  (Doc. 40-19 at ¶ 11; Doc. 40-20 at ¶ 11.)  Thompson discussed his previous interaction with the Officer Defendants and his reason for being in the Dollar General parking lot. (Doc. 40-2; Doc. 40-19 at ¶ 12; Doc. 40-20 at ¶ 12.)  At this time, Thompson did not mention experiencing a heart attack, stroke, or any other medical emergency, nor did he request medical assistance.

---

[3] The videos show that Thompson acted very similar to how he had acted the previous evening.

The Officer Defendants did, however, smell alcohol on Thompson. (Doc. 40-19 at ¶ 12; Doc. 40-20 at ¶ 13.) While Officer Rodgers looked inside Thompson's vehicle, Officer Hendrix patted Thompson down. (Doc. 40-19 at ¶ 13; Doc. 40-20 at ¶ 13.) Thompson's breathing quickened during this interaction, and Officer Hendrix told Thompson, "Breathe. Breathe, man. You're freaking out. I don't like it." (Doc. 40-3 at 02:10.) Immediately after Hendrix's instruction, Officer Rogers asked Thompson how many beers he had consumed as there was an opened beer can in the vehicle's center console. (Doc. 40-2 at 02:08; Doc. 40-19 at ¶ 13.) Thompson answered, "Four, five, six—I don't know." (Doc. 40-2 at 02:08; Doc. 40-19 at ¶ 13.) Importantly, Thompson denied using any drugs. (Doc. 40-2.)

Next, Thompson gave permission to Officer Hendrix to search his wallet and to Officer Rogers to search the vehicle. (Doc. 40-19 at ¶ 14; Doc. 40-20 at ¶ 14.) The search began, and as it proceeded, Thompson stated that he thought he was having a panic attack, to which Officer Hendrix again instructed him to breathe. (Doc. 40-3 at 03:20; Doc. 40-20 at ¶ 16.) Thompson then asked for a cloth for his head and stated, "Help me. I'm about to fucking have a heart attack and die, dude."[4] (Doc. 40-3 at 03:20; Doc. 40-20 at ¶ 16.) Officer Hendrix asked, "Why? What's wrong with you?" Thompson answered, "My whole body hurts." (Doc. 40-2 at 03:45; Doc. 40-3 at 03:20; Doc. 40-19 at ¶ 15; Doc. 40-20 at ¶ 16.)

After Thompson's last comment, Officer Rogers paused his search to ask Thompson if he was okay and whether Thompson had consumed any drugs or alcohol. (Doc. 40-2 at 03:45; Doc. 40-3 at 03:50; Doc. 40-19 at ¶ 15.) Thompson did

---

[4] Officer Rogers testified that he never heard Thompson's comment about a heart attack but that he would not have done anything differently based on his observations that Thompson was not in medical distress. (Doc. 40-24 at 76:12–23–77:1–10.) He then testified that had he heard Thompson's comment about a possible heart attack and the comment about his whole body hurting, Rogers may have contacted EMS at that time. (Doc. 40-24 at 149:18–23–150:1.)

not answer the question; he instead turned to wave both arms at a passing SUV and stated, "Come get me," while he motioned and pointed to himself. (Doc. 40-2 at 03:45; Doc. 40-3 at 03:50.) Thompson identified the person as his aunt, but the driver rolled down her window and said that she did not know him. (Doc. 40-2 at 03:45; Doc. 40-3 at 04:00; Doc. 40-19 at ¶ 16; Doc. 40-20 at ¶ 17.)

Based on their interactions and observations of him, the officers believed that Thompson was intoxicated, that he had lied about his physical symptoms to avoid arrest, and they did not think he was in medical distress. (Doc. 40-19 at ¶ 16; Doc. 40-20 at ¶ 17.) Officer Rodgers then placed Thompson in handcuffs, verbalized that Thompson was "sweating bullets," and informed Thompson that he was going to jail. (Doc. 40-2 at 04:30.) While he was being cuffed, Thompson told Officer Hendrix that it was dark and he was scared, but he then asked if the driver of the vehicle was old—a reference to whether the driver was his aunt.[5] (Doc. 40-3 at 04:20.)

Thompson repeatedly asked Officer Hendrix to remove the handcuffs or place them in the front; Officer Hendrix refused, stating that this was for his safety. (Doc. 40-3 at 04:50; Doc. 40-20 at ¶ 19.) Thompson then climbed into the back of the police vehicle unassisted and allowed Officer Hendrix to remove his sunglasses and lanyard from his neck. (Doc. 40-3 at 05:10; Doc. 40-20 at ¶ 19.) At this point, Thompson stated, "I think I'm having a fucking stroke, man." (Doc. 40-3 at 05:10; Doc. 40-20 at ¶ 19; Doc. 40-2 at 08:00.)   Officer Hendrix told Thompson that he was definitely not having a stroke but that he would contact medical. (Doc. 40-3 at 05:10; Doc. 40-20 at ¶ 19.) Hendrix believed Thompson's stroke complaints were "B.S." (Doc. 40-3 at 08:05; Doc. 40-20 at ¶ 23.)   Officer Rogers stated that

---

[5] Officer Hendrix's body camera footage shows that Thompson is breathing heavier than when the officers first arrived, but he is still alert, cooperative, ambulatory, and communicative. (Doc. 40-3 at 04:50.)

Thompson would be fine. (Doc. 40-2 at 08:00.)   According to the Officer Defendants, they had been trained on the FAST method of stroke recognition, and nothing they observed suggested a stroke. [6]  (Doc. 40-19 at ¶ 21; Doc. 40-20 at ¶ 20.)

The video footage shows that the officers discussed the likelihood of Thompson being under the influence of illegal substances, as Officer Rogers thought Thompson had "done more than marijuana," (doc. 40-2 at 07:30; doc. 40-3 at 07:43), and Officer Hendrix expected that he would find a pipe within Thompson's belongings during the search (doc. 40-2 at 07:30; doc. 40-3 at 07:40). The officers continued to search Thompson's belongings, which contained several phones. (Doc. 40-2; Doc. 40-3.)  During the search, Officer Rodgers asked, "why does meth heads always got phones?" and "yea, he's got dope somewhere." (Doc. 40-2 at 08:20; Doc. 40-3 at 08:05.)  The footage also shows Rogers explaining his suspicions that Thompson had taken or possessed illegal substances: "The way he's freaking out and the way he's sweating—it's hot out here, but it ain't that hot." (Doc. 40-2 at 08:40.) They never found a pipe or any drugs other than possible marijuana residue and beer.  (*See* Doc. 40-2; Doc. 40-3.)

In Officer Rogers's experience, excessive sweating was an indicator that an arrestee may have drugs in his system, but he was unaware that excessive sweating could indicate an adverse reaction to drug ingestion. (Doc. 40-24 at 62:10–21, 63:16–21.) Though Rogers received the dispatch call for someone clutching their chest and mouthing the words, "help me" and he knew he was responding to a possible medical situation, upon investigation and his observations of Thompson's behavior, Rogers did not think Thompson was experiencing a health concern. (Doc.

---

According to the officers, their training on the FAST method stands for "Face, Arms, Speech, Time."  "F" involves examining a person's face to see if it is drooping on one side. "A" is for an inability to raise both arms.  "S" is for slurred speech. And "T" is a reminder to note the time that the symptoms appear.  (Doc. 40-19 at ¶ 21; Doc. 40-20 at ¶ 20.)

40-24 at 67:1–20.)  Based on these observations and Thompson's false statements about the individual in the passing SUV, Rogers believed any medical complaints Thompson made were a way to avoid being taken to jail. (Doc. 40-24 at 78:3–16.) Rogers did suspect, however, that Thompson was under the influence of more than alcohol and that he had taken methamphetamine. (Doc. 40-24 at 64:21–23, 69:7–11.)

Because Thompson tried to break out of the handcuffs on the way to the jail, the Officer Defendants called ahead to request that the jail staff have the restraint chair ready upon Thompson's arrival.  (Doc. 40-8; Doc 40-19 at ¶ 27.)

### 2.    Geneva County Jail

Officers Rogers and Hendrix arrived with Thompson at the jail at 7:30 p.m. (Doc. 40-9; Doc. 40-19 at ¶ 28; Doc. 40-20 at ¶ 31.) Video evidence shows Thompson exiting the vehicle under his own power and walking into the jail without difficultly except for a stumble when he stepped off a curb. (Doc. 40-9.)

When Thompson entered the jail, Jailer Miller did not observe any signs of medical distress. (Doc. 40-27 at 28:8–10.) In his deposition, he testified that Thompson "walked in the [j]ail just like eighty percent, ninety percent of the people" who are intoxicated.  (Doc. 40-27 at 28:8–12.)   The officers secured Thompson in a restraint chair at 7:34 p.m.  (Doc. 40-19 at ¶ 29; Doc. 40-20 at ¶ 32.)  Still, at this point, neither officer saw signs of medical distress, and Thompson did not request medical treatment.  (Doc. 40-19 at ¶ 29; Doc. 40-20 at ¶ 32.)

Next, Officer Rogers completed a handwritten arrest report and documented that he believed Thompson was under the effects of drugs and had been drinking. (Doc. 40-10; Doc. 40-19 at ¶ 30.)   Because of his belief that Thompson was intoxicated, Officer Rogers placed a twelve-hour hold on Thompson so that the jail staff would hold Thompson until he was sober.  (Doc. 40-19 at ¶ 30; Doc. 40-10.)

He did not, however, inform the jail staff of his suspicion that Thompson had taken methamphetamine. (Doc. 40-24 at 23:14–18.)

Officer Hendrix completed the jail intake form. (Doc. 40-11.)   This form asked for Thompson's medical conditions and whether Thompson was under the influence.  (Doc. 40-11.)  Next to the blank for medical conditions, Officer Hendrix wrote, "weed apparently." (Doc. 40-11.) And next to the blank for whether Thompson was under the influence, he wrote, "most likely meth: A Lot!" (Doc. 40-11; Doc. 40-20 at ¶ 33.)

At 7:47 p.m., Jailer German placed Thompson, who was already secured in the restraint chair, in the detox cell.  (Doc. 40-12; Doc. 40-19 at ¶ 31; Doc. 40-20 at ¶ 34; Doc. 40-23 at 22:1–6.)  Because the detox cell is equipped with a video camera, Jailer Miller was able to consistently monitor Thompson while in the cell.  (Doc. 40-27 at 44:9–17.)   Both Jailer Defendants thought Thompson had been medically cleared before placing him in the restraint chair.  (Doc. 40-23 at 23:23–24:1–2; Doc. 40-27 at 135:2-8.) Once an inmate arrives at the jail, the booking jail officer has the discretion to call for EMS if that officer suspects a medical concern. (Doc. 40-27 at 136:1-5.) Neither Miller nor German booked Thompson; another jailer booked Thompson and handled the paperwork and did not call EMS. (Doc. 40-23 at 50:13–14; Doc. 40-27 at 19:14–15.)

Thompson remained in the restraint chair for almost two hours from 7:47 p.m. to 9:36 p.m. (Doc. 40-12.)  When he first arrived in the cell, Thompson kicked his feet, was alert, communicative, and agitated. (*Id*.)  The video shows Thompson repeatedly attempting to extract himself from the restraints.  (*Id*.) Jailer Miller testified that he thought Thompson's behavior was due to alcohol intoxication and equated the behavior to other intoxicated inmate behaviors he had observed before. (Doc. 40-27 at 80:7–15, 96:15–23.)

At 8:57 p.m., Jailer German entered the cell to readjust the restraint straps. (Doc. 40-12 at 1:11:10.)  While there, German asked Thompson whether he had taken any drugs, (doc. 40-23 at 36:5–7, 37:11–15), but again Thompson denied drug use, instead stating that he had consumed beer.  (Doc. 40-23 at 36:5–7, 37:11–15.) That said, Jailer German noticed Thompson's excessive sweating and paleness, and that he just "didn't look good," so Jailer German notified Jailer Miller. (Doc. 40-23 at 36:10–11, 39:4–5.)

At 9:05 p.m., Jailers German and Miller entered the cell together. (Doc. 40-12 at 11:18:50.)  Miller asked Thompson routine assessment questions, such as "are you okay?" (Doc. 40-27 at 106:10–13.) When Thompson did not respond although he was still moving, Miller called for an ambulance. (Doc. 40-27 at 106: 14–19; Doc. 40-12 at 1:20:55.)

Geneva Rescue Medics Taylor Floyd and Rod Utley (collectively "medics") arrived at 9:14 p.m.  At this time, Thompson was still moving and responding to painful stimuli, but over the course of their assessment, his movements slowed and tapered. (Doc. 40-12 at 1:28:06.)  The medics assessed Thompson and suspected that he was under the influence of methamphetamine. (Doc. 40-21 at ¶ 8–9; Doc. 40-22 at ¶ 9.)  Utley thought Thompson was intoxicated, but he did *not* perceive that Thompson was in medical distress. (Doc. 40-21 at ¶ 10.)  When Floyd asked Thompson what illegal substance he had ingested, Thompson again denied drug use and instead stated he had consumed beer.  (Doc. 40-22 at ¶ 9.)  When the medics took Thompson's vitals, his heart rate was 162 beats per minute. (Doc. 40-21 at ¶ 11; Doc. 40-22 at ¶ 11.) With this knowledge, the medics transported Thompson to the hospital. (Doc. 40-21 at ¶ 13; Doc. 40-22 at ¶ 11.)  By the time the Officer

Defendants wheeled Thompson out of the cell at 9:35 p.m., Thompson's eyes were closed and his arms and legs limp.[7] (Doc. 40-12 at 1:48:28.)

### 3.    The Hospital and Autopsy

Around 9:45 p.m., the medics transported Thompson to Wiregrass Hospital. (Doc. 40-19 at ¶ 34; Doc. 40-20 at ¶ 37.)  Shortly after 11:00 p.m., a nurse noticed that Thompson's breathing had stopped.  Despite several minutes of resuscitation efforts, the emergency room physician pronounced Thompson dead at 11:20 p.m. (Doc. 40-20 at ¶ 39; Doc. 52-19 at 4.)  The ER workup "was notable for signs of myocardial ischemia with an elevated troponin" level, an indicator that Thompson may have suffered a heart attack. (Doc. 52-8 at 4). The ER physician's clinical impression noted that Thompson was intoxicated and had suffered an acute myocardial infarction and cardiopulmonary arrest with intoxication.  (Doc. 52-19 at 2.)

Thompson's body underwent an autopsy.  The final toxicology report showed a large concentration of methamphetamine in Thompson's blood and no alcohol. (Doc. 40-13 at 7.)  According to the autopsy report, Thompson's cause of death was declared as "[t]oxic effects of [m]ethamphetamine."  (Doc. 40-13 at 3.)

## C.    Lawsuit

On November 8, 2022, the Estate sued the Officer Defendants and the Jailer Defendants.  In its operative complaint, the First Amended Complaint, the Estate claims that these four individuals violated Thompson's Fourteenth Amendment rights because they were deliberately indifferent to Thompson's serious medical needs.  (Doc. 27 at 7.)  In particular, the Estate claims that, while in the parking lot

---

[7] Outside the detox cell and before placing Thompson on the EMS stretcher, one of the medics administered an intramuscular injection of ketamine to subdue Thompson.  (Doc. 40-27 at 119:13–22, 121:1–7; Doc. 40-23 at 86:1–2, 14–18 (observation made outside the detox cell); Doc. 43-20 at 5.)

at the Dollar General, Thompson said, "he was having a stroke, which is an objectively serious medical condition that would require treatment constituting a serious medical need" and that "methamphetamine overdose is an objectively serious medical condition that requires treatment constituting a serious medical need." (Doc. 27 at 8.) The Estate argues that the Officer Defendants "disregarded [these risks of serious harm and Thompson's dire medical needs] and acted with deliberate indifference by taking . . . Thompson to the drunk tank at the Geneva County [j]ail instead of the [e]mergency [r]oom." (Doc. 27 at 8.)

As to the Jailer Defendants, the Estate claims that they acted with deliberate indifference because they "admit[ed] [Thompson] to the jail and strapp[ed] him into a restraint chair in the drunk tank [instead of] insisting [that] he be transported to the hospital or immediately summoning emergency medical assistance" despite their knowledge of Thompson's need for medical treatment for a likely methamphetamine overdose. (Doc. 27 at 9-10.)  As to all of them, the Estate claims that had Thompson received timely medical treatment, his life could have been saved.  (*See* doc. 27 at 10–11.)

## D.    Expert Witnesses and Their Opinions

The parties have retained expert witnesses who primarily speak to issues involving methamphetamine toxicity and causation.

According to Dr. Matthew Delany, an emergency medicine physician retained by the Estate, there is no established lethal amount of methamphetamine. Therefore, in Dr. Delany's opinion, if Thompson had received medical attention earlier, his methamphetamine overdose was manageable and therefore survivable.  (Doc. 52-8 at 4–5; Doc. 40-26 at 40:14–23).  Further, according to Dr. Delany, Thompson's ER workup confirmed that Thompson suffered from a myocardial infarction (i.e., heart attack).  (Doc. 40-26 at 70:2–10.)

The Defendants retained several experts, including a forensic toxicologist, two forensic pathologists, an emergency room physician, and a law enforcement specialist. According to Dr. Bruce Goldberger, a forensic toxicologist (doc. 40-14 at 2), Dr. Francisco Diaz, a forensic pathologist (doc. 40-15 at 2), and Dr. Upshaw Downs, a forensic pathologist (doc. 40-17 at 6, 9), Thompson consumed a lethal (and therefore unsurvivable) amount of methamphetamine. Therefore, there was no amount of medical intervention, regardless of its timing, that could have changed the outcome. According to Dr. Gregory Ledbetter, an emergency room physician, Thompson did not show signs of acute medical distress during his interactions with law enforcement but did exhibit the typical signs of methamphetamine use. (Doc. 40-16 at 5–6.) Dr. Ledbetter also opined that earlier medical intervention would not have changed the outcome because of the amount of methamphetamine Thompson had taken. (*Id.*) Finally, Steve Watkins, a retired police chief with experience in dealing with individuals who have ingested drugs, believes Thompson's change of condition during the hours preceding his death was typical of individuals who ingest drugs. (Doc. 40-18 at 5–8.)

## DISCUSSION

The Estate sues the Defendants under 42 U.S.C. § 1983 for their alleged deliberate indifference to Thompson's serious medical needs in violation of the Fourteenth Amendment. The Defendants assert their entitlement to qualified immunity.

Qualified immunity offers complete protection for government officials sued in their individual capacities when acting within their discretionary authority if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To prevail on a § 1983 claim against a government official acting within his discretionary authority – which is not at issue here – the Estate "must show (1)

15

the [D]efendants' conduct violated a constitutional right or statutory right and (2) that the right violated was clearly established." *See Mann v. Taser Intern., Inc*., 588 F.3d 1291, 1305 (11th Cir. 2009).  The Defendants argue that the Estate cannot meet either prong.

## A.   Constitutional Violation

The first inquiry in reviewing the Estate's § 1983 claim is to determine whether the Estate has sufficiently alleged and shown a constitutional violation. Only if the Estate adequately shows such a violation, must the Court examine the alleged basis for liability for the Officer and Jailer Defendants. "Without a . . . violation, there can be no violation of a clearly established right."  *Smith v. Siegelman*, 322 F.3d 1290, 1295 (11th Cir. 2003).

The Estate contends that the Defendants were deliberately indifferent to Thompson's serious medical needs as a pre-trial detainee by failing to send him to the emergency room or alternatively having him seen by medical personnel.  (Doc. 27 at 10–11.)   While a pre-trial detainee's rights exist under the Fourteenth Amendment, a claim for deliberate indifference to a serious medical need is subject to the same analysis as if brought under the Eighth Amendment. *Mann*, 588 F.3d at 1306.   Therefore, to prevail on an Fourteenth Amendment claim of deliberate indifference to a serious medical need, the Estate must show 1) that Thompson had a serious medical need—an objective standard, 2) that the Defendants were subjectively aware that their own conduct, whether it be action or inaction, put Thompson at substantial risk of serious harm, with the caveat that even if the Defendants actually knew of a substantial risk, a reasonable response to that risk negates the existence of deliberate indifference, and 3) causation between the indifference and Thompson's injury; here, his death. *Mann*, 588 F.3d at 1306–07; *Wade v. McDade*, 106 F.4th 1251, 1258, 1262 (11th Cir. 2024) (en banc).  Because the material facts viewed in the light most favorable to the Estate fail to establish

deliberate indifference by any of the Defendants, this analysis ends at the second element.

In its Amended Complaint, the Estate identifies two serious medical conditions, however they are related and somewhat inextricably intertwined. First, the Estate alleges that Thompson "stated to the Defendants when they arrived that he was having a stroke," which according to the Estate is an objectively serious medical condition requiring medical treatment. (Doc. 27 at 8.) Second, the Estate alleges that Thompson was suffering from a methamphetamine overdose that was also an objectively serious medical condition requiring treatment. From the combination of these two, the Estate alleges that it was clearly obvious that Thompson "needed immediate medical treatment." (*Id*.)

In their summary judgment motion, the Officer Defendants argue that Thompson was not suffering from a stroke and that he showed no other serious medical need, let alone an obvious one. They also state that the Estate should not be allowed to recharacterize its complaint allegations in its summary judgment briefing as a case based on drugs and a heart attack. And lastly, the Officer Defendants assert that, while they may have suspected that Thompson had consumed more than just alcohol, there was nothing during their interaction with Thompson in the Dollar General parking lot that indicated a serious medical need. To support this, they argue: (1) that symptoms of drug intoxication alone are not necessarily indicative of a serious medical need, (2) that throughout their interaction Thompson was communicative, ambulatory, compliant, and alert, (3) that Thompson's behavior did not indicate that he had consumed a lethal dose of methamphetamine, and (4) that Thompson's two isolated statements about a heart attack and stroke during a twenty-minute interaction were not corroborated by any actual evidence of either at the scene.

The Estate has not presented evidence that Thompson suffered a stroke at any point, nor has the Estate presented evidence that Thompson suffered a heart attack at the Dollar General parking lot. It is true that the ER workup later that evening revealed that Thompson may have suffered a heart attack before his death, but no evidence has been presented, from an expert or otherwise, as to *when* exactly that heart attack occurred.  After all, the series of events began twenty-four hours before his death when Thompson first interacted with law enforcement. The events then continued in the parking lot at the Dollar General the next day, and then later in jail where Thompson was still alert, ambulatory, and responsive—only there did Thompson deteriorate to an unresponsive state. Finally, the saga concluded at the hospital later that evening.  At any point along that timeline, Thompson could have suffered a heart attack.  The Estate, however, has not presented evidence to suggest when that was.

That aside, the real issue is Thompson's methamphetamine ingestion and whether that ingestion—and resulting toxicity (or intoxication)—constituted a serious medical condition.  On one hand, the expected reaction (i.e., a high) to a drug is not a serious medical condition, *see Burnette v. Taylor*, 533 F.3d 1325, 1332 (11th Cir. 2008), but on the other hand, toxicity due to ingesting a lethal or fatal amount is.  Obviously, Thompson's condition vis-a-vis methamphetamine ingestion went from a simple reactionary state or high to a deadly condition.  And viewed in the light most favorable to the Estate, the Estate sufficiently established that Thompson suffered from a medical condition – a potentially fatal one – that began in the Dollar General parking lot.  After all, Thompson's cause of death was the "[t]oxic effects of [m]ethamphetamine."  (Doc. 40-13 at 3.)

But the pertinent question is whether the Estate has shown a serious medical *need*. A serious medical need is one that a physician diagnoses as needing treatment, one that "is so obvious that . . . a lay person" would recognize the need for medical

treatment, or one where "a delay in treat[ment] . . . worsens the condition." *Mann*, 588 F.3d at 1307 (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  For example, most heart attacks constitute a medical condition accompanied by a serious medical need because 1) they usually present with classic signs and symptoms that lead laypersons to recognize the need for treatment, *see, e.g., Gartman v. Cheatham*, No. 2:18cv543, 2022 WL 714643, at *6 (M.D. Ala. Mar. 9, 2022), or 2) physicians order further treatment, *see Carter v. Broward Cnty. Sheriff Off.*, 710 F. App'x 387, 391 (11th Cir. 2017) (explaining a "slight heart attack" is a serious medical need *when* diagnosed by a physician as needing treatment).  But with drug or alcohol intoxication, not every case constitutes a serious medical need.  *See Mann*, 588 F.3d at 1308; *Burnette*, 533 F.3d at 1331–33 ("The Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol.").

The Estate argues that Thompson had an objectively serious medical need — methamphetamine toxicity that induced a fatal heart attack.  Viewing the facts in the light favorable to the Estate for summary judgment purposes, the Court concludes that the Estate has provided sufficient evidence (primarily through his expert witness) showing that had Thompson's condition been treated sooner (even in the parking lot at the Dollar General), he could have survived.  Thus, because a delay in treatment worsened his condition, Thompson's methamphetamine toxicity (and its related effects such as excited delirium or a heart attack) created a serious medical need.  *See Mann*, 588 F.3d at 1307.

The Defendants' assertion that the Estate cannot show deliberate indifference to that serious medical need is a different matter and is the dispositive issue here. The Defendants argue that there is insufficient evidence to show that any of them

knew of and disregarded an excessive risk to Thompson's health nor were they aware of facts from which it could be inferred that a substantial risk of harm existed.  In other words, the Estate cannot show that the Defendants were subjectively aware that their own conduct put Thompson at substantial risk of serious harm, and even if they did hold such awareness, the Estate cannot show that they acted unreasonably in response to that risk.  *See Wade*, 106 F.4th at 1257–59.

To establish deliberate indifference, a plaintiff must show that 1) the "official was subjectively aware" of the "risk of serious harm," 2) the "official disregarded that risk," and 3) the official acted with the same "subjective recklessness as used in the criminal law." *Wade*, 106 F.4th at 1255  (quotations omitted).

Under the first prong, whether an officer had the requisite subjective awareness "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (explaining that a "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").  The officer, however, "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Id.* at 837 (emphasis added).  Thus, an officer cannot be liable for his "failure to alleviate a significant risk that he *should have perceived but did not*." *Burnette*, 533 F.3d at 1331 (quoting *Farmer*, 511 U.S. at 838).  And one officer's subjective awareness cannot be imputed to another. *Id*.  A court may, however, deem an officer's willful blindness to a fact as constructive subjective awareness.  *See Goebert v. Lee Cnty.*, 510 F.3d 1312, 1328 (11th Cir. 2007) ("Choosing to deliberately disregard, without any investigation or inquiry, everything any inmate says amounts to willful blindness.").

In the context of allegations involving deliberate indifference to persons who have ingested an illegal drug, the Eleventh Circuit's decision in *Mann v. Taser Int'l,*

*Inc.,* is instructive. There, a woman smoked methamphetamine and ransacked a home, and when law enforcement arrived, she was wandering in the backyard screaming about demons who had stolen her treasure. *Mann*, 588 F.3d at 1299. The officers knew the woman was a methamphetamine user from previous encounters with her and because family members had told them that she was "sick" and needed medical treatment. *Id*. Rather than taking her to the hospital, the officers placed her in their police vehicle and transported her to jail. *Id.* at 1300–01. She arrived at the jail unresponsive with labored breathing. *Id.* at 1301. She died shortly after she was transported to the hospital. *Id.*

The estate in that case sued and claimed that the officers were deliberately indifferent by not *immediately* transporting the woman to the hospital based on the fact that the officers were aware of 1) her methamphetamine use, 2) her delusional state, and 3) her family members' statements about her need for medical treatment. *Id.* at 1307. The district court granted summary judgment to the defendants, and the Eleventh Circuit affirmed. *Id.* at 1301–02, 1312.

In its opinion, the Eleventh Circuit noted that prior to the woman's death, her "behavior did not indicate that she had a serious medical need. Her physical resistance [sic] and verbal communication suggested to the deputies that although agitated, [the woman] was not in immediate medical danger." *Mann*, 588 F.3d at 1307–08. Therefore, despite the officers' awareness of the *obvious* delusional state and the family's request for medical treatment, the officers were not deliberately indifferent because no facts showed that the officers "were aware of the serious risk of harm" that would result from "a delay in treatment." *Id.* at 1307–08. The Eleventh Circuit further held that no facts indicated that the woman's condition was anything more than a "temporary reaction to the known use of methamphetamine," and the record failed to establish that the officers knew that the condition could lead to death without treatment. *Id.* Without this knowledge, the "Constitution does not

21

require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Id.* at 1308 (quoting *Burnette*, 533 F.3d at 1333). Thus, because they were *unaware* that their decision to take the woman to jail instead of the hospital placed the woman at a substantial risk of death, the officers did not have the requisite subjective awareness of a risk of serious harm even though they observed the woman's methamphetamine-induced "excited delirium."[8] *Id.* at 1307–08.

The facts in *Mann* are close enough to those presented here such that *Mann* largely dictates the outcome of the deliberate indifference issue presented here for both the Officer Defendants and the Jailer Defendants.

### 1.    The Officer Defendants

#### i.    Subjective Awareness

As it concerns the Officer Defendants, the record does not show that they had subjective awareness of Thompson's risk of serious harm or death.  The record only shows that the Officer Defendants were aware of the likelihood that Thompson had consumed alcohol and that he was under the influence of, and temporarily reacting to, an illegal substance—likely methamphetamine.   From the start, Thompson himself told the officers that he had been drinking alcohol and denied drug use. Thompson was also ambulatory, communicative, cooperative, and alert.  And while he was agitated and fidgeting, his behavior was much like the two interactions with the officers the evening before and common for an intoxicated individual.

Thompson did make two isolated statements about a heart attack and stroke during a twenty-minute interaction with law enforcement.  But he also made them when he was ambulatory, communicative, and cooperative, and when he repeatedly expressed his desire not to go to jail.  These statements, in context of the totality of

---

[8] The plaintiffs described the woman's state as "excited delirium"—a term used to describe "a state of agitation, excitability, paranoia, [and] aggression . . . ." *Mann*, 588 F.3d at 1299  n.4.

the events of both May 20 and 21, do not equate to objective proof of a serious medical need so as to give the Officer Defendants subjective awareness of that need. Even a hypercritical review of the video footage does not show an individual exhibiting signs of a serious and potentially deadly medical condition needing immediate medical treatment.

The Estate makes several arguments to try to establish subjective awareness. But the Estate's out-of-context presentation and narrow focus on certain statements allude to inferences that are not based in the record.  The Court does not have to accept the Estate's inferences as true when they derive from "cherry picked" evidence and are unsupported by the record's context.  *See Scott*, 550 U.S. at 380–81; *Penley*, 605 F.3d at 848; *Johnson*, 491 F. App'x at 950–51.  When the video footage clearly contradicts the Estate's version of the facts, as it does here, the Court views those "facts in the light depicted by the [video evidence]." *Scott*, 550 U.S. at 380–81.  And the facts in that light, depict a different story from the one the Estate paints—the video evidence instead shows that neither of the Officer Defendants knew that Thompson was experiencing anything more than a "temporary reaction to the known use of methamphetamine." *Mann*, 588 F.3d at 1307–08.  It also fails to show that the Officer Defendants knew that Thompson had consumed a fatal amount of methamphetamine or was experiencing methamphetamine toxicity to such an extent that it would cause a stroke, heart attack, or death.

For example, the Estate argues that the Officer Defendants' refusal to believe Thompson's medical complaints "without any investigation or inquiry" amounted to "willful blindness," such that they were deliberately indifferent. (Doc. 51 at 30–37.) But the video evidence contradicts that assertion.  The video evidence reveals that the Officer Defendants had two previous interactions with Thompson the day before, and when the Officer Defendants observed Thompson on the day of his arrest, they observed his speech, mannerisms, and ability to walk and respond to

questions, which were all similar to how Thompson acted during the previous interactions; regardless, they questioned him and even asked him about drug use, which he denied.  Thompson did not exhibit the symptoms typically associated with a stroke or heart attack, nor did he exhibit symptoms indicating he had ingested a fatal amount of methamphetamine.

And while the Estate asserts that a reasonable jury could conclude that the Officer Defendants inferred that Thompson was at risk of serious harm based on the contents of the dispatch call, the record shows that the Officer Defendants arrived on scene with knowledge that dispatch had decided against calling a medical responder.  This suggested to them that there was not a medical emergency of any sort.  Then, when they arrived, Thompson was not clutching his chest and exhibited no other physical symptom of pain or medical concerns; he did not ask for help, to be taken to the hospital, or for medical attention; and he denied using drugs.  Instead, he told the Officer Defendants that he was waiting on his "baby's momma," the same person he had been complaining about the evening before.  Notably, he walked, communicated, and obeyed instructions throughout the Officer Defendants' encounter with him.

Throughout their encounter with Thompson, the Officer Defendants observed a scene much like the one encountered by law enforcement in *Mann* where the woman's "physical resistance [sic] and verbal communication" was behavior that indicated to the officers, that "although agitated, [the woman] was not in immediate medical danger." 588 F.3d at 1307–08.  Here too, Thompson's actions and verbal communications indicated to the Officer Defendants that "although agitated," Thompson was "not in immediate medical danger." *Id*.

The Estate also argues that Thompson's verbal medical complaints would "allow a reasonable jury to infer that the [officers] consciously drew [an] inference" such that they were subjectively aware of a risk of serious harm. (Doc. 51 at 40.)

24

But the two isolated statements about a heart attack and stroke must be considered in the context of the preceding twenty-four hours and not be cherry-picked from the record. And the video evidence does not support that inference either. For example, after saying he was about to have a heart attack, Thompson's attention immediately diverted to an SUV, which he tried to wave down claiming the driver was his aunt. She was not. Without other signs from which the officers could perceive a risk of harm, the Estate's cherry-picked facts do not support that the Officer Defendants inferred that Thompson's isolated medical complaint was legitimate.

Thompson's reference to suffering a stroke too—in this context—is not enough for a reasonable jury to find that the Officer Defendants "dr[ew] the inference" such that they were subjectively aware of a risk. *Farmer*, 511 U.S. at 837. The risk of stroke, according to the Officer Defendants' training, was nonexistent considering his ability to walk, talk without slurring, move his extremities, and lack of facial droop, all of which are signs indicative of a stroke. Further, the stroke complaint occurred after Officer Hendrix placed Thompson in the police vehicle and after being told that he was going to jail—a fear that he had repeatedly expressed the evening before. And this, of course, was already after Thompson stopped making a medical complaint to wave down a stranger in an SUV. While the Estate argues that under *Goebert*, an automatic refusal to believe an arrestee's medical complaints regardless of the circumstances amounts to willful blindness, in this case, the evidence shows that the officers' refusal to believe Thompson was *because of* the circumstances. The evidence, in context, shows that the Officer Defendants inferred that Thompson was *not* having a stroke. And the video footage supports it.

The Estate also argues that the Officer Defendants inferred that Thompson was in medical distress based on Thompson's physical symptoms: shortness of breath, confusion, and sweating. Viewed in the light depicted by the video—and when not available, most favorable to the Estate—the Officer Defendants did

observe all these physical symptoms. But the record does not show that the Officer Defendants inferred that Thompson was in medical distress. The Officer Defendants' statements captured in the video—"[he] done more than marijuana," "he's got dope somewhere," and "[t]he way he's freaking out and the way he's sweating—it's hot out here, but it ain't that hot" (doc. 40-2; doc. 40-3)—show only that they inferred that Thompson was under the temporary influence of illegal substances, as Thompson was largely in the same state and exhibited the same symptoms as the evening before.

Even if the Officer Defendants should have connected all the dots—Thompson's confusion, sweating, sporadic and varying medical complaints, and the likelihood of methamphetamine intoxication—and should have inferred that Thompson was at risk of impending medical distress including death, the Officer Defendants cannot be liable for their "failure to alleviate a significant risk that [they] should have perceived but did not." *Burnette*, 533 F.3d at 1331 (quoting *Farmer*, 511 U.S. at 838). Instead, the officers must have "both . . . [been] aware of facts" from which they could draw the requisite inference *and actually* have "draw[n] the inference." *Farmer*, 511 U.S. at 837 (emphasis added). Because the facts do not support that either officer drew the requisite inference, their knowledge of Thompson's physical signs was not enough to create subjective awareness of Thompson's risk of serious harm; that is, a heart attack and/or death.

Finally, the Estate argues that the Officer Defendants held the requisite subjective awareness because they "were consciously aware that [Thompson] had ingested a dangerous amount of methamphetamine." (Doc. 51 at 41.) The Officer Defendants did conclude that Thompson was under the influence of alcohol and likely methamphetamine. And the Estate asserts that this fact—coupled with the Officer Defendants' desire to ensure that the jail staff provided Thompson with the appropriate attention due to their concern for his safety—shows that the Officer

Defendants were subjectively aware of a risk of serious harm.  (Doc. 51 at 42, 47.)
These facts may show that the Officer Defendants were aware of *a* possible risk, but
they do not show that the officers were aware or inferred that Thompson was *at* risk
of "*serious* harm"; that is, death or at least something more than a temporary reaction
to drugs. *Wade*, 106 F.4th at 1255 (emphasis added).  And the "Constitution does
not require" the officers here to have sought "medical attention for [Thompson just
because he] appear[ed] to be affected by drugs or alcohol."  *Mann*, 588 F.3d at 1308
(quoting *Burnette*, 533 F.3d at 1333).  Contrary to the Estate's assertion, if any
inference is to be drawn from the Officer Defendants' actions here, it is that they
took a reasonable precaution to notify others of Thompson's possible condition to
ensure Thompson received appropriate care if needed, which, as discussed further
below, undermines any assertion of deliberate indifference.

Even though the Officer Defendants understood Thompson needed
monitoring, no evidence shows that they perceived medical distress requiring
immediate medical attention.  Again, to be liable, the Officer Defendants must have
"both . . . [been] aware of facts" from which they could draw the requisite inference
*and actually* have "draw[n] the inference." *Farmer*, 511 U.S. at 837.  Because the
facts do not support that either officer drew the requisite inference, their knowledge
of Thompson's alcohol intoxication and likely drug use, even if severe, was not
enough to create the requisite subjective awareness.  As such, summary judgment is
due to be granted as to the Officer Defendants because of the lack of a factual
question on this issue.

ii.   **Subjective Recklessness**

The Officer Defendants also argue that the Estate has not shown that they met the requisite level of subjective recklessness as used in criminal law, and even if they did, that they acted unreasonably to the risk. [9]  The Court agrees.

As it concerns subjective recklessness, the governing standard requires that the defendant was "actually, subjectively aware that his own conduct caused [the] substantial risk of serious harm to the plaintiff." *Wade*, 106 F.4th at 1256, 1262 ("[T]he criminal law [allows] a finding of recklessness only when a person disregards a risk of harm of which he is aware." (quotations and alterations omitted)); *see Farmer*, 511 U.S. at 837–40.  But it is not enough to show that a defendant had subjective awareness that a person *faced* a substantial risk of serious harm; the question considers the attitude of the defendant and his knowledge that his own action or inaction *caused* the person to be at risk of serious harm.  *Wade*, 106 F.4th at 1257–59 (analyzing *Farmer*, 511 U.S. at 845: "The Court's focus . . . was on whether the official knew his own conduct . . . put the inmate at risk, not just whether the inmate confronted a risk in the abstract" (internal quotations omitted)).  Therefore, even if a defendant had actual knowledge of "a substantial risk to [an arrestee's] health or safety," the defendant is not liable if he acted "reasonably to [that] risk." *Wade*, 106 F.4th at 1262 (quotations omitted); *see, e.g., Rutledge v. Sansing*, No. 21-CV-00226, 2024 WL 3839516, at *15–16 (N.D. Ala. Aug. 15, 2024) (finding that despite officer's awareness of inmate's health risk to high

---

[9] The parties dispute whether the Estate alleged the requisite criminal recklessness. (Doc. 56 at 29–30; Doc. 64 at 2.)  The Eleventh Circuit took the opportunity in *Wade* to clear up confusing language that courts in this circuit previously used. *Wade*, 106 F.4th at 1254.  The Estate is correct in arguing that *Wade* "does not represent a sea change in the applicable standard for deliberate indifference cases," (doc. 64 at 7), because the United States Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994), established years ago that the requisite subjective recklessness is the same as used in criminal law. *See generally Wade*, 106 F.4th at 1253.  The Court finds that the Estate sufficiently argued the requisite criminal recklessness element such that the Estate did not abandon the argument.

temperatures and the inmate's resulting death from hyperthermia, the officer acted reasonably where he chose to do nothing further than the scheduled temperature checks because nothing indicated that a heating issue would go undetected under the usual checks the officers performed).   In the same vein, a "failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence. *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000).

Here, the Estate is correct in stating that "[t]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." (Doc. 51 at 44 (quoting *Patel v. Lanier Cty.*, 969 F.3d 1173, 1190 (11th Cir. 2020).)  But the Estate failed to show that the Officer Defendants held the subjective knowledge of Thompson's need for medical care.  The record does not show that the Officer Defendants knew that Thompson ingested a lethal dose of methamphetamine or that he needed immediate medical care—only that he might need care *if* he deteriorated—a "risk in the abstract." *Wade*, 106 F.4th at 1259.  Once again, what the record does show is that during their interactions with Thompson, the Officer Defendants observed Thompson's ability to walk unassisted, communicate, and attempt to break out of his handcuffs, and Thompson denied drug use.  Despite this and not perceiving any medical distress, at least one officer took *reasonable* action to check on Thompson several times while the other continued the search of Thompson's vehicle.  And viewed in the light most favorable to the Estate, the evidence also shows that while the Officer Defendants knew that Thompson faced a possible risk because of his intoxication, they took reasonable action to provide documentation during Thompson's booking to ensure that the jail staff monitored him until he was sober.

To prevail on this prong, the Estate must show that the Officer Defendants had "actual[] . . . aware[ness] that [their] own conduct caused [the] substantial risk

of serious harm." *Wade*, 106 F.4th at 1256, 1262.   Without knowledge that Thompson needed immediate medical treatment, the Officer Defendants could not have acted with the requisite recklessness.   Neither officer had experience with an individual dying from a methamphetamine overdose, and Officer Rogers specifically thought individuals who were overdosing were "already . . . passed out," (doc. 40-24 at 16:15–18), and Thompson presented the opposite picture.   Because the "Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol," *Mann*, 588 F.3d at 1308 (quoting *Burnette*, 533 F.3d at 1333), and the Officer Defendants did not perceive signs of medical distress, the Officer Defendants' decision to take Thompson to jail where they knew he could be monitored was reasonable. Thus, even if the Officer Defendants were aware of a possible risk, because they acted reasonably to that risk, the Officer Defendants lacked the requisite subjective recklessness to be liable for deliberate indifference. *See Wade*, 106 F.4th at 1256, 1262. The Officer Defendants are entitled to summary judgment on this basis also.

### 2.   Jailer Defendants

#### i.   Subjective Awareness

The Jailer Defendants, like the Officer Defendants, also move for summary judgment and assert that there is insufficient evidence to show that they had subjective awareness of a risk of serious harm to Thompson.   The Estate responds with two points.

First, the Estate argues that the Jailer Defendants had "substantially the same information" as the Officer Defendants because, in his deposition, Officer Hendrix testified that while he did not remember relaying Thompson's health statements to the jailers, he "very well could have" and it would have been "typical of [him] to

provide" that information at booking.  (Doc. 51 at 45–46.)[10]  But even assuming Officer Hendrix *did* tell the Jailer Defendants about Thompson's earlier medical complaints, it is undisputed that both Jailer Defendants thought Thompson had already been medically cleared. (Doc. 40-23 at 23:23–24:1–2; Doc. 40-27 at 135:2–8; *see* Doc. 51 at 46 (arguing only that Jailer Defendants failed to ensure policy was followed).)  And nothing in the record supports that Thompson initially acted in a way or verbalized anything to put the Jailer Defendants on notice that Thompson needed immediate medical intervention.  Jailer Miller observed Thompson walk into the jail "just like eighty [to] ninety percent" of intoxicated inmates (doc. 40-27 at 28:8–12), and Thompson never verbalized any medical complaints to either of the Jailer Defendants.  Even though the Jailer Defendants may have received medical information from the officers' earlier encounter with Thompson, the record does not show a genuine issue of material fact as to the Jailer Defendants' subjective awareness of Thompson's medical need based on information received from the officers.

Second, the Estate argues the Jailer Defendants knew that Thompson had taken a "dangerous amount of methamphetamine" because of the information found on the jail intake form. (Doc. 51 at 46.) The Estate argues that although it was another jailer who received the jail intake form, reasonable jurors could infer that one or both

---

[10] "I think" type statements, such as Hendrix's here, are only "scintilla[s] of evidence" that even viewed in the light most favorable to the nonmovant, are insufficient to survive summary judgment. *See United States v. Stein*, 769 F. App'x 828, 832–33 (11th Cir. 2019) (holding defendant's affidavit statement "[v]iewed in the light most favorable to [the nonmovant]" that it was her "unwavering contention" that to the "best of her recollection," she *believed* that she had paid all her taxes to be only "'a scintilla of evidence,' which [was] not enough to survive summary judgment" (cleaned up) (citing *Jameson v. Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge."))); *Atl. Specialty Ins. v. Digit Dirt Worx, Inc.*, 793 F. App'x 896, 901–05 (11th Cir. 2019) (affirming district court's exclusion of statements of conjecture at summary judgment phase).  But here, the Estate's arguments still fail even considering these statements.

of the Jailer Defendants initially received it because there are two copies of the intake form—the original, unsigned one found in the jail's file, and the copy, signed by Deputy Sanchez after Thompson's death and provided to ALEA.  According to the Estate, "the retention of the unsigned copy" means that "*someone* made a copy of that unsigned form." (*Id.* at 47 (emphasis added).) And this someone, the Estate argues, *could be* inferred by a reasonable jury to have been either of the Jailer Defendants because Hendrix testified that "he *likely* handed the form to Miller or German." (*Id.* (emphasis added).)

The Jailer Defendants counter, stating that both testified that they did not receive the intake form and that they did not know Thompson was under the influence of methamphetamine.  The Estate's assertion that the "someone" to whom Officer Hendrix "likely" handed the intake form was one of the Jailer Defendants constitutes conjecture.  But even assuming the Jailer Defendants knew that Thompson was under the influence of "a lot" methamphetamine (*see* doc. 40-20 at ¶ 33), no evidence supports that the intake form entry — "a lot" of meth — put the Jailer Defendants on notice that "a lot" equated to a *lethal* amount of methamphetamine.  And here too, the Jailer Defendants were under no constitutional obligation to seek medical treatment for Thompson as an "inmate who appear[ed] to be affected by drugs or alcohol." *Mann*, 588 F.3d at 1308 (quoting *Burnette*, 533 F.3d at 1333).  Even if the Jailer Defendants should have perceived that "a lot" of meth equated to a dangerous or lethal amount, they cannot be liable for their "failure to alleviate a significant risk that [they] should have perceived but did not." *Burnette*, 533 F.3d at 1331.  Viewed in the light most favorable to the Estate, the record still fails to support that the Jailer Defendants held the requisite subjective awareness of Thompson's risk of serious harm.

### ii.   Subjective Recklessness

The Jailer Defendants also argue there is insufficient evidence to show that they acted with subjective recklessness.  The Court once again agrees. The Estate argues that the Jailer Defendants knew that their own conduct — their placement of a restrained Thompson in the detox cell and failure to immediately call the medics — equates to subjective recklessness because of the Jailer Defendants' awareness of Thompson's cardiac and other medical complaints. But the record shows that the Jailer Defendants thought Thompson had already received medical clearance. Further, Thompson did not initially exhibit signs of or verbalize the need for immediate medical intervention.  Thus, their decision to monitor Thompson in the detox cell was reasonable.

Also, assuming, as the Estate argues, that the Jailer Defendants understood Thompson was intoxicated, be it because of alcohol or methamphetamine, the Estate can point to no evidence that even suggests that the Jailer Defendants were "actually, subjectively aware that" their placement of Thompson in the detox cell or failure to immediately call the medics at Thompson's arrival "caused [Thompson's] substantial risk of serious harm." *Wade*, 106 F.4th at 1256–57, 1262.  Like the Officer Defendants, the Jailer Defendants may have understood that Thompson faced a risk of serious harm in the abstract (whether it be due to meth or alcohol intoxication), but that is not enough.  *Id.* at 1257–59. Because the evidence does not support that the Jailer Defendants knew that their own actions caused Thompson to be at risk of serious harm, *id.*, and they responded reasonably to any abstract risk when they monitored Thompson until they detected deterioration, at which point they called for the medics, the record does not support that the Jailer Defendants acted with the requisite recklessness. *Id.* at 1262; *see also Taylor v. Starr*, No. 20-CV-489, 2023 WL 3956156, at *6–7 (N.D. Ala. June 12, 2023) (finding that a jail nurse was not deliberately indifferent when she failed to place meth-intoxicated

inmate in a monitoring cell even though she *knew* inmate was under the influence of methamphetamine but where she did not suspect a risk of death and when she reasonably thought jail staff would notify her of any deterioration).

The Estate further argues that neither jailer ensured that Thompson, an intoxicated inmate, received medical screening before jail admission.  While this is true, as both jailers testified that they thought Thompson had already received medical clearance, their failure to follow jail policy, while likely negligent, also does not amount to the level of recklessness as used in criminal law.  *See Wade*, 106 F.4th at 1256–60, 1262; *Taylor*, 221 F.3d at 1259; *Taylor*, 2023 WL 3956156, at *6, 10. To show the requisite recklessness related to the Jailer Defendants' failure to follow jail policy, the Estate needed to show that the Jailer Defendants *knew* that their failure (their conduct or omission) to follow policy when booking an intoxicated individual into the jail placed that intoxicated individual, here Thompson, at a substantial risk of harm.  *See Farmer*, 511 U.S. at 842 (explaining a plaintiff could establish deliberate indifference if the risk of harm is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"); *Taylor*, 221 F.3d at 1259; *Taylor*, 2023 WL 3956156, at *10.  But the Estate did not do that.  And once again, even if the Jailer Defendants understood that Thompson faced an abstract risk because of meth-intoxication without medical clearance, the "Constitution does not require an arresting police officer or jail official to seek medical attention for every arrestee or inmate who appears to be affected by drugs or alcohol." *Mann*, 588 F.3d at 1308 (quoting *Burnette*, 533 F.3d at 1333).  Their decisions to 1) monitor Thompson in the detox cell under video surveillance—just like other intoxicated inmates and 2) to call EMS when they recognized his deterioration were reasonable under the circumstances, which include the facts that Thompson communicated with the jailers, told Jailer German that he only "drank beer," actively struggled against the restraint chair, and had walked into the jail "just like eighty percent, ninety

34

percent" of intoxicated inmates (doc. 40-27 at 28:8–12). Because the Jailer Defendants did not know that their failure to follow jail policy placed Thompson at a substantial risk and because they acted reasonably under the circumstances, they were not criminally reckless. *Wade*, 106 F.4th at 1256, 1262. Since there is no question of fact here, the Jailer Defendants are entitled to summary judgment due to his issue.

**B.    Clearly Established Law**

Aside from asserting the Estate's inability to show a constitutional violation for deliberate indifference to a serious medical need for purposes of the qualified immunity analysis, the Defendants argue in the alternative that even if such a showing can be made, the Estate still cannot show that the Defendants violated clearly established law.

Whether a right or law was clearly established "turns on the objective legal reasonableness," *Ziglar v. Abbasi*, 582 U.S. 120, 151 (2017) (internal quotations marks omitted) (quoting *Harlow*, 457 U.S. at 819), of the defendants' actions "in light of the specific context of the case," *Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324, 1333 (11th Cir. 2023), *cert. denied sub nom. Benning v. Oliver*, 144 S. Ct. 1457 (2024) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021)). It is the specific context of the case that determines whether "every reasonable official would have understood that what he is doing violates" a legal right. *Id.* "[P]rison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." *Hill*, 40 F.3d at 1186 (quoting *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992)). Therefore, "[a] finding of deliberate indifference necessarily precludes a finding of qualified immunity." *Id.*

In this district, for "purposes of qualified immunity, decisions of the Supreme Court, the Eleventh Circuit, or the [Alabama Supreme Court] can announce clearly

35

established law." *Benning*, 71 F.4th at 1333. The Court looks to the law as it stood at the time of the alleged wrongful conduct and does "not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* at 1334 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63–64 (2018)). "The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 583 U.S. 48, 63 (2018) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  A court decision that finds no constitutional violation, however, does not clearly establish law that defines conduct violating the Constitution.  *See Jackson v. City of Atlanta*, 97 F.4th 1343, 1363 (11th Cir. 2024) ("A decision holding that an officer did not violate the Fourth Amendment by failing to intervene in that case cannot possibly establish — much less clearly establish — that an officer did violate the Fourth Amendment in another case by failing to intervene.").

Violation of a constitutional right is clearly established one of three ways:

(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).  The Estate argues the second way: "the Eleventh Circuit has repeatedly given officials notice of the broad principle that the knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to . . . constitute deliberate indifference."  (Doc. 51 at 57 (internal quotations marks and alteration omitted) (quoting *Patel v. Lanier County, Georgia*, 969 F.3d 1173, 1190 (11th Cir. 2020)).  It argues this clearly established Eleventh Circuit precedent should have placed Defendants on notice that "flatly ignore[ing]" Thompson's

36

medical needs was a violation of such law. (Doc. 51 at 58).  But to "rel[y] on [the] general rule" that officers cannot be deliberately indifferent to the serious medical needs of pretrial detainees, "it must be obvious that the general rule applies to the specific situation in question." *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).

A sister court in *Taylor v. Starr*, No. 20-489, 2023 WL 3956156 (N.D. Ala. June 12, 2023), confronted a similar question—whether it was obvious that the law enforcement defendants violated a pretrial detainee's right to be free of deliberate indifference to his serious medical needs related to methamphetamine toxicity when the detainee died after law enforcement and jailers failed to request a medical check. Analyzing *Mann* and *Burnette v. Taylor*, 533 F.3d 1325 (11th Cir. 2008), the district court concluded that "[g]iven the caselaw . . . it [was not] obvious that the law enforcement defendants violated [the deceased pretrial detainee's] right to be free of deliberate indifference to his serious medical needs." *Taylor*, 2023 WL 3956156, at *4, 8, 11.

In *Burnette* (a 2008 decision),[11] the Eleventh Circuit affirmed summary judgment for a jailer-defendant who had failed to seek medical attention for a pretrial detainee that had slurred speech, needed help walking, and who the jailer knew had a pill bottle in his possession prior to the arrest.  The detainee overdosed and died, but the Eleventh Circuit held that the detainee "did not manifest signs of a serious medical need" and cited to an Eighth Circuit decision which also affirmed summary judgment where an officer and jailers knew the decedent had been under the influence of methamphetamine. *Burnette*, 533 F.3d at 1332–33 (citing *Grayson v. Ross*, 454 F.3d 802, 809 (8th Cir. 2006) ("Even assuming that [the officer] was deliberately indifferent to [the inmate's] constitutional rights, it would not be clear

---

[11] The *Mann* decision (a 2009 decision) has already been discussed.

37

to a reasonable officer that his conduct was unlawful in the situation he confronted, because [the inmate's] medical needs were not objectively serious.")).

Here too, the Court concludes that because there are insufficient facts showing that any of the Defendants perceived Thompson's behavior to be anything more that "a temporary reaction to the known use of methamphetamine," it is not obvious that any of the Defendants here violated Thompson's right to be free of deliberate indifference to his serious medical need.  And the Estate certainly has failed to show that the Defendants violated clearly established law in their actions, especially in the face of the Eleventh Circuit's decisions in *Mann* and *Burnette*.

## CONCLUSION

The Court acknowledges the tragedy in this case.  The Estate's arguments, however, consistently present out-of-context facts and paint the picture that Thompson begged for help and begged for his medical needs to be taken seriously, only to have the Defendants completely ignore him with disregard to whether he lived or died.  But that was not the set of facts presented here, especially when the video footage is viewed.  The Defendants have shown their entitlement to qualified immunity.  Accordingly, it is hereby ORDERED that the Defendants' *Motions for Summary Judgment* (doc. 39; doc. 41) are GRANTED.  A separate judgment will issue.

**DONE** on this the 6th day of November 2024.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE